UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

AARON G.[1],                          )
                                      )
          Plaintiff,                  )
                                      )
    v.                                )        CIVIL NO.  1:19cv232
                                      )
ANDREW SAUL,                          )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

<u>OPINION AND ORDER</u>

This matter is before the court for judicial review of a final decision of the defendant Commissioner of Social Security Administration denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), as provided for in the Social Security Act. 42 U.S.C. § 423(a), § 1382c(a)(3).  Section 405(g) of the Act provides, inter alia, "[a]s part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).

The law provides that an applicant for disability insurance benefits must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental

_____

[1]  To protect privacy, Plaintiff's full name will not be used in this Order.

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. *Gotshaw v. Ribicoff*, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); *Garcia v. Califano*, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. *See Jeralds v. Richardson*, 445 F.2d 36 (7th Cir. 1971); *Kutchman v. Cohen*, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." *Garfield v. Schweiker*, 732 F.2d 605, 607 (7th Cir. 1984) citing *Whitney v. Schweiker*, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984) quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); *see Allen v. Weinberger*, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." *Garfield*, *supra* at 607; *see also Schnoll v. Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.       The claimant meets the insured status requirements of the Social security Act

through December 31, 2016.

2.   The claimant has not engaged in substantial gainful activity since January 22, 2016, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.   The claimant has the following severe impairments: degenerative disc disease, status cervical fusion, status post lumbar laminectomy, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except cannot work on ladders, ropes, or scaffolds or work on slippery or uneven surfaces; can occasionally use ramps and stairs; can occasionally balance, stoop, and crouch, but not crawl or kneel; no working around unprotected heights or dangerous machinery; cannot operate a motor vehicle as a condition of employment; and is limited to simple and routine work.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on February 20, 1979 and was 36 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled." whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569. 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 22, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14 - 22).

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed his opening brief on November 15, 2019. On January 24, 2020, the defendant filed a memorandum in support of the Commissioner's decision, to which Plaintiff replied on February 7, 2020. Upon full review of the record in this cause, this court is of the view that the ALJ's decision must be remanded.

A five-step test has been established to determine whether a claimant is disabled. *See Singleton v. Bowen*, 841 F.2d 710, 711 (7th Cir. 1988); *Bowen v. Yuckert*, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

*Nelson v. Bowen*, 855 F.2d 503, 504 n.2 (7th Cir. 1988); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff was born on February 20, 1979. (R. at 255). At the time of the administrative hearing, he was 39 years of age. (R. at 12). Plaintiff received a GED. (R. at 281). Plaintiff previously worked in shipment and as a flooring installer. (R. at 281).

The record shows that Plaintiff's first issues arose on March 10, 2013, when he presented to the emergency department at Tanner Medical Center with complaints of an injury to the right side of his head and right shoulder. (R. at 328). On that day, Plaintiff was attempting to remove a tree located close to a house and, unfortunately, the pulley system that was set up to pull the tree away from the house broke and struck him on the right side of his head and shoulder. *Id*. A CT of the brain showed evidence of a 4.2cm hematoma "overlying the parietal region the calvarium." (R. at 332). Plaintiff was warned that he may have difficulties with memory, concentration, and headaches. (R. at 329). Additionally, he was advised to avoid activities that would put him at risk for significant head injury and avoid strenuous activity. *Id*.

A lumbar MRI completed on April 25, 2014, demonstrated disc herniation at the L5-S1 level traversing the S1 nerve root, degenerative spondylosis at the L4-5 and L5-S1 level, and prominent epidural fat narrowing the thecal sac at the L4-5 and L5-S1 levels. (R. at 388). The cervical MRI completed on the same date demonstrated multilevel degenerative cervical spondylosis with canal narrowing and neural foraminal narrowing and enlarged adenoids. (R. at 390).

On June 6, 2014, Plaintiff attended a new patient visit with Dr. Anna Dumas at Medical East Clinic with complaints of a rash, a knot on his ankle, stomach issues, back pain, fatigue, and depressed mood. (R. at 429). Dr. Dumas noted a "nontender movable mass" under Plaintiff's left armpit. *Id*. Dr. Dumas assessed tinea corpis, depression, GERD, weight gain, and low back pain.

*Id.* Plaintiff was prescribed Lotrisone cream, Wellbutrin, Ibuprofen 800, Omeprazole, Testosterone, and Lopid. (R. at 430). Lab work completed on this date demonstrated high triglycerides (189), and low testosterone (185). (R. at 442-443).

On June 11, 2014, a soft tissue ultrasound was conducted on Plaintiff's left armpit at Decatur Morgan Hospital which showed a solid reniform nodule. (R. at 454). Dr. John Owens' impression was that it was a prominent lymph node consistent with benign lymphadenopathy. *Id.* Plaintiff attended a follow up visit with Dr. Dumas on June 20, 2014, with reports of ongoing headaches since the time of his head injury in 2013. (R. at 431). He explained that his headaches lasted 40 minutes and were accompanied with blurry vision. *Id.* Dr. Dumas diagnosed headaches, muscle spasms, sleep apnea, and fatigue. *Id.* Plaintiff was provided a testosterone shot; he was prescribed Ibuprofen 800 and Flexeril. (R. at 431-432).

On July 10, 2014, Plaintiff attended a follow up visit with Dr. Dumas. (R. at 433). Plaintiff stated that his family recently lost their home and all their possessions in a fire, and since that time he started experiencing several panic attacks. *Id.* Plaintiff was diagnosed with chronic pain syndrome, insomnia, anxiety, and rectal bleeding. *Id.* Dr. Dumas referred him to a gastroenterologist and prescribed Xanax. *Id.*

On July 16, 2014, Plaintiff attended an appointment with Dr. Kantamneni at Decatur Digestive Diseases (R. at 455). Plaintiff complained of abdominal pain in the lower to middle abdomen, diarrhea and red blood in his stool as well as nausea and vomiting. (R. at 455-456).

On July 24, 2014, Plaintiff underwent an EGD and colonoscopy at Decatur Ambulatory Surgery Center. (R. At 447). Findings were made for GERD, esophagitis, internal hemorrhoids, and a polyp was removed for biopsy. *Id.*

The pathology report from Prime Path, PC on July 25, 2014, noted diagnosis of chronic gastritis based on the antral biopsy and a diagnosis of hyperplastic polyp from the colon polyp biopsy. (R. at 446).

On March 3, 2015, Plaintiff again presented himself to Dr. Dumas with complaints of back pain, memory loss, slurred speech, and mood swings. (R. at 435). Plaintiff admitted he had been drinking alcohol to ease his pain and stated he had been seeing a counselor at TVPC. *Id*. He reported a 20 minute episode of left chest pain with SOB and palpitations two weeks prior. *Id*. Dr. Dumas prescribed Ibuprofen 800 and Omeprazole. *Id*. Labwork completed on this date demonstrated high cholesterol (236), high triglycerides (190), low testosterone (85), low vitamin D (10). (R. at 439-440).

A thoracic spine MRI completed March 11, 2015, demonstrated a small hemangioma behind T6. (R. at 460).

A cervical spine MRI completed March 14, 2015, demonstrated the following degenerative changes: straightening of the cervical spine curvature; disc osteophyte, mild foraminal narrowing and uncovertebral degenerative changes at C3-C4; disc osteophyte and mild foraminal narrowing at C5-C6. (R. at 414).

A lumbar spine MRI completed on March 27, 2015, demonstrated disc herniation with severe compression of the nerve root, significant recess narrowing, mild foraminal narrowing, disc desiccation with small disc bulge at L4-L5, and the epidural lipomatosis at L4-L5 persists. (R. at 465). A brain MRI completed on this same date noted generalized atrophy. (R. at 467). Plaintiff attended an appointment with Dr. Kimberly Chaney at North Central Neurology Associates on March 31, 2015, regarding his memory loss, slurred speech, and mood swings. (R.

at 398). Plaintiff reported that since his accident in 2013 he experienced the following cognitive issues: trouble putting words together, repeating himself, confusion, quick to anger, fatigue, zoning out, daily headaches, and stumbling. (R. at 398-399). Dr. Chaney's diagnoses included headache, cervical radiculopathy, encephalopathy, dizziness/vertigo, and chronic fatigue. (R. at 400). Nuedexta and Vimpat were prescribed. *Id*.

On May 11, 2015, Plaintiff attended an appointment with Dr. Jason Banks at Spine & Neuro Center. (R. at 408). He reported the following symptoms: pain from the base of the neck across his shoulders into the hands, numbness in the 4th and 5th digits of both hands, weakened grip and difficulty with fine motor skills resulting in dropping items, inability to lift hands above his head, pain in the right hip that goes into the right foot, numbness in both feet, and cramping in both calves. *Id*. Dr. Banks noted that Plaintiff demonstrated difficulty with shoulder abduction above his shoulder, which was worse on the right than the left, and a slightly weak grip on the right compared to the left. (R. at 410). Dr. Banks reviewed the thoracic MRI, noting minimal adjacent level disease at C3-C7 with minor degenerative changes. *Id*. Dr. Banks also reviewed the lumbar MRI, which demonstrated degenerating disc L4-5 and a large disc protrusion at L5 and S1. *Id*. Lumbar x-rays completed during this visit demonstrated loss of disc space height at L4-5 and L5-S1. (R. at 412). Dr. Banks noted, "My impression is he has significant pains all over his body but more importantly a right S1 radiculopathy." *Id*. Dr. Banks and Plaintiff agreed on a right L5-S1 laminectomy, discectomy, and nerve decompression. (R. at 472). Dr. Banks prescribed Medrol Dosepak and Mobic. *Id*.

On May 21, 2015, Plaintiff returned to Dr. Dumas, and she removed his warts for him during this visit. (R. at 437). His blood pressure was elevated (150/101) which he attributed to his

stress. *Id.* Dr. Dumas prescribed Adipex for his obesity. *Id.* Plaintiff's UDS demonstrated positive findings for alcohol and hydrocodone on 5/28/15. (R. at 438).

Dr. Jason Banks wrote a letter on May 28, 2015, regarding his assessment and plan for Plaintiff. (R. at 471). Dr. Banks provided the following diagnoses: cervicalgia, brachial neuritis or radiculitis, degeneration of cervical intervertebral disc, lumbago, thoracic or lumboscaral neuritis or radiculitis unspecified, and displacement of lumbar intervertebral disc without myelopathy. (R. at 471). Dr. Banks' impression was Plaintiff suffered from significant pain all over his body with right radiculopathy being the worst. (R. at 472).

Plaintiff underwent right L5-21 discectomy and nerve decompression on June 9, 2015. (R. at 350).

On July 6, 2015, Plaintiff returned for a post-op follow up appointment with Dr. Banks (R. at 350). He had some "greenish drainage" and was prescribed Bactrim to treat his wound. (R. at 351). Plaintiff requested carpal tunnel release on right arm. Dr. Banks requested a copy of his EMG nerve conduction study. *Id.*

Plaintiff attended an initial patient evaluation with Dr. Ann Still at Comprehensive Pain Specialists on January 25, 2016. (R. at 340). He rated his pain a seven and described it as constant. *Id.* By his report the pain interfered with daily chores, employment, house chores, mood, sleep, relationships, and walking. (R. at 340-341). His BMI was 42.27. (R. at 342). The physical exam noted "decreased right hand (median nerve)," tenderness in the midline area of the lumbar and cervical spine, and positive Tinel's on the right hand. *Id.* Dr. Still provided the following diagnoses: cervical and lumbar radiculopathy; post laminectomy syndrome; chronic pain. (R. at 342). Plaintiff was instructed to continue using Norco and was prescribed Lyrica. *Id.*

On January 27, 2016, Plaintiff met with Dr. Banks. (R. at 346). Plaintiff reported pain in his back, legs, and arms along with numbness and tingling in his right arm through the hand. (R. at 347). Dr. Banks reviewed the MRI scan and determined that Plaintiff had cervical radiculopathy and spondylosis from the C3 to C7 region. *Id*. Dr. Banks recommended a cervical CT to evaluate Plaintiff's back and leg pain. *Id*.

Plaintiff attended a visit with Dr. Harbin on September 14, 2016, with complaints of high anxiety and continued sinus issues. (R. at 366). BMI was 45.2. *Id*. He was diagnosed with sinusitis and anxiety syndrome, Dr. Harbin prescribed Rocephin, Xanax, Zpack, EdaHist, and refilled Norco. *Id.*

On October 18, 2016, Plaintiff presented himself to Dr. Harbin for a prescription refill on Norco and Flonase. (R. at 368). He reported ongoing pain and sinus issues. *Id*. He was diagnosed with rhinitis and prescribed Flonase, Singulair, Zyrtec, and Norco was refilled. *Id*.

Plaintiff visited Dr. Harbin on November 21, 2016 to discuss his mood swings describing very "low lows" and really "high highs." (R. at 369). Dr. Harbin provided the diagnoses of depression, mood swings, anxiety, and chronic back pain. *Id*. Dr. Harbin prescribed Xanax, Zyprexa, Depakote, and refilled Norco. (R. at 370).

On December 23, 2016, Plaintiff returned to see Dr. Harbin for prescription refills. (R. at 371). Plaintiff explained that he was unable to fill the Zyprexa due to lack of insurance and cost. *Id*. He reported that the Depakote was no longer helping; he felt nervous all the time. *Id*. Plaintiff had a history of alcohol abuse, he denied drinking but stated "that demon is really knocking on the door." *Id*. Dr. Harbin diagnosed bipolar affective disorder- depressed, fatigue, anxiety, and candidiasis of unspecified site. *Id*. Plaintiff was prescribed Risperdal, Xanax, and Norco was

refilled. (R. at 372).

On January 23, 2017, Plaintiff visited Dr. Harbin requesting medication refills. (R. at 373). Plaintiff reported he started a new job, but was unable to make it through the workday without Norco. *Id*. Dr. Harbin provided diagnoses of muscle spasms and tinea corporis. *Id*.

On June 28, 2017, Plaintiff attended an appointment with Dr. Sharon Singleton requesting a referral to pain management. (R. 384). His BMI was 44.17. (R. 383). A rash was noted on left axilla and posterior left ankle during physical examination. (R. at 385). Dr. Singleton prescribed Nystatin cream, Medrol Dosepak, Sertraline, and completed referral for pain management. *Id.*

On February 9, 2018, Plaintiff attended a mental status examination with Dr. Leslie Predina as referred by DDB. (R. at 498). Dr. Predina noted that Plaintiff's mood suggested feelings of depression and anxiety, his ability to sustain concentration was impaired, and he had difficulty recalling information. (R. at 499). Dr. Predina's impression noted Plaintiff demonstrated issues with his cognitive functioning, slight impairment in judgment and common sense, his orientation appeared impaired, was experiencing minor memory problems, and had slightly impaired understanding of arithmetic. (R. at 501). She estimated that his IQ would be low average to average in range. *Id*. Dr. Predina diagnosed Plaintiff with major Depressive Disorder and Generalized Anxiety Disorder. *Id*. Dr. Predina completed a Medical Source Statement of Ability to Do Work Related Activities, and she reported that Plaintiff's ability to understand, remember, and carry out instructions were affected by his impairment. (R. at 502). Dr. Predina also indicated that Plaintiff's ability to interact appropriately with supervision, co-workers, and public, as well as respond to changes in the routine work setting were affected by his impairments. (R. at 503).

Plaintiff underwent a physical examination with Dr. John Mericle on February 13, 2018, as referred by DDB. (R. at 507). At the time of the evaluation Plaintiff was taking Xanax. *Id.* The functional capacity test revealed that Plaintiff could walk 100 yards, stand for 10-15 minutes, climb one flight of stairs, and lift 20 lbs. (R. at 508). Abnormal range of motion were found in the following areas: cervical flexion, cervical extension, cervical rotation, lumbar forward flexion, and lumbar extension. (R. at 515). Dr. Mericle provided the following statement: "This claimant's chief problem in his low back pain that makes his legs go numb. He also has pain in his neck from prior fusion." (R. at 516).

Dr. Mericle completed a Medical Source Statement of Ability to Do Work Related Activities, he reported that Plaintiff could occasionally lift and carry up to ten pounds. (R. at 518). Dr. Mericle indicated that Plaintiff could sit, stand, walk for 15 minutes at a time. (R. at 519). During an eight hour work day, it was suggested that Plaintiff could sit for three hours, stand for three hours, and walk for two hours of the day. *Id.* Dr. Mericle restricted Plaintiff's reaching overhead with both arms overhead, operation of foot controls, climb stairs/ramps, and balance to occasionally. (R. 520-521). Plaintiff should never climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (R. at 521). His exposure to moving mechanical parts, operating a motor vehicle, humidity/wetness, and pulmonary irritants should be limited to occasional. (R. at 523). He should never be exposed to unprotected heights, extreme cold/heat, or vibrations. *Id.*

Plaintiff presented for an administrative hearing on January 8, 2018 in Fort Wayne, Indiana in front of ALJ John Carlton and was represented by attorney Nick Lavella. (R. at 596). Mr. Lavella started with his opening statement, and he noted that Plaintiff had been diagnosed with degenerative disc disease in his lumbar and cervical spine with a history of cervical spine

fusion in 2006. (R. at 599). He informed the ALJ that the claimant experienced a work injury in 2013 which resulted in a head injury and subsequent lumbar laminectomy in June 2015. *Id*. Mr. Lavella noted this surgery was followed by a diagnosis of post-laminectomy syndrome or failed back syndrome. (R. at 599). He referred to an MRI from March 2015, prior to this surgery, which demonstrated a large right paracentral disc herniation extrusions with severe compression of the exiting nerve route on the right side. *Id*. The MRI in April 2014, after the fusion, showed multilevel degenerative cervical spondylosis resulting in moderate left neural foraminal narrowing at C4-C5 and C5-C6. (R. at 599-600). Mr. Lavella also noted that Plaintiff's obesity (BMI over 40), memory problems, right carpal tunnel, and history of left carpal tunnel release complicated his problems. (R. at 600). He argued that Plaintiff's other conditions of positive straight leg raise, diminished strength and sensation affected his ability to sustain the work postures needed to complete a sedentary job on a full-time basis. *Id*. Additionally, the claimant's reduced ability to concentrate, remember, and use his right hand for handling, grasping, fingering result in additional work restrictions. *Id*. Mr. Lavella informed the ALJ that Plaintiff recently had a failed work attempt as a part-time internet customer service representative and prior to that he also had a failed work attempt making refrigerators for GE. (R. at 600-601).

The ALJ started his examination of the claimant by asking about his work history, Plaintiff responded the last time he worked was a month prior to the hearing as a customer service representative for Xbox/Microsoft. (R. at 602). At this job he worked from home approximately 20 hours a week and was responsible for answering calls, communicating with customers, data entry, problem solving, and troubleshooting. (R. at 602-603). When the ALJ asked Plaintiff why he only worked 20 hours, he explained that he could not sit for more than 30 to 45 minutes at a

time before the pain set in. (R. at 604). Plaintiff made minimum wage at this job and stayed with the company for two months. *Id*. The ALJ informed the vocational expert that the user support analyst would not be considered as past relevant work. (R. at 605). Between 2016 and 2017, Plaintiff worked for Lyons HR doing assembly line work for GE refrigerators where he started off putting ice makers into freezers. However, he was moved to a sit-down job within a week as he wasn't able to do the overhead work. (R. at 605). His next position with this company consisted of placing solenoids into a circuit board, and he had difficulty maintaining this position due to the continuous movement and long periods of sitting. (R. at 606). Plaintiff verified that he worked full time at this position for approximately $8.25 an hour. (R. at 606-607).

Between 2015 and 2016 Plaintiff worked for Labor Force doing shipping in a sheet factory where he stacked, labeled, bound, and shipped bed sheets. (R. at 607-608). Plaintiff recounted that he lifted up to 50 pounds of pallets of bed sheets at this position. (R. at 608). He informed the ALJ that he left this job because of his pain and not meeting quota. (R. at 609). In 2014 Plaintiff worked for Commercial Flooring Services installing flooring, where he lifted up to 300 pounds. *Id*. Prior to that Plaintiff worked for Mann's Tower Service where he was responsible for assembling antennas and placing them on top of cell phone towers, however he was unable to make it to the top of the tower due to his back pain. (R. at 610-611). In 2007 and 2008 Plaintiff was self-employed; he installed commercial and residential flooring. (R. at 611). In 2005 he was employed by Mid-America Management and was responsible for building maintenance at an apartment complex. He informed the ALJ the heaviest thing he lifted was refrigerators, stoves, and furniture. (R. at 611-612).

Mr. Lavella started his examination of the Plaintiff by asking about his living situation.

Plaintiff stated he lived alone in a two story home with a basement and noted that his daughter visited on the weekends. (R. at 612). He had moved to Indiana from Alabama after a "nasty divorce" to be closer to family and had been struggling to obtain Medicaid since that time. (R. at 612-613). When Mr. Lavella asked Plaintiff about the reason he held several jobs since 2014, he responded that he was unable to do things fast enough, was physically incapable, and also noted trouble with confusion which affected his ability to multitask. (R. at 614). Mr. Lavella asked the claimant to identify his physical problems. Plaintiff responded that his neck hurt with pain radiating down to his hands which would make his hands numb and made it difficult to hold on to anything. *Id*. His lower back pain also caused shooting pain down his legs and numbness which required him to alternate between sitting and standing. (R. at 614-615).

When Mr. Lavella asked about his lower back surgery in 2015, Plaintiff indicated it made things worse. (R. at 615). Prior to losing his health insurance Plaintiff was involved in pain management and was prescribed Norco, however this medication only helped for two to three hours. (R. at 615-616). At the time of the hearing he was not on any pain medication and rated his pain as a seven out of ten and recounted that when he took Norco his pain was only reduced to a four or five during the first hour of use. (R. at 616-617). He explained that this medication caused him to become irritable. (R. at 617). Mr. Lavella noted that Plaintiff had tried a TENS unit, physical therapy, chiropractic therapy, and two surgeries. *Id*. When asked how long he could sit at one time, Plaintiff stated 30 to 45 minutes before his pain became too much to handle, and he would be shifting in his chair. (R. at 618). When asked how long he could be on his feet, Plaintiff stated the could push himself to 35 to 45 minutes at one time. (R. at 619). Plaintiff's neck pain would shoot into both hands and cause numbness after 10 to 15 minutes and would wake him

from sleep. (R. at 619-620). Plaintiff testified he received left carpal tunnel release over ten years prior and since that time the numbness had returned to his left side. (R. at 620). He cited the reason for not obtaining right carpal tunnel release as the lack of health insurance and money. (R. at 620-621). Mr. Lavella asked Plaintiff how much he could lift and carry, he responded approximately 20 pounds. (R. at 621). He also described difficulty with twisting and bending which prevented him from tying his shoes therefore he had switched to Velcro. (R. at 622). He also described trouble concentrating due to the pain. *Id*. He noted the most comfortable position is in a recliner with his feet inclined. (R. at 623). Next Plaintiff spoke about his memory issues which have caused him to leave his coffee pot on, flood his kitchen after forgetting the water was running, and forget to pick his 15 year old daughter up for visits. (R. at 624). His weight at the time of the hearing was 290. *Id*.

The ALJ asked Plaintiff about flooring work he was doing as documented in a medical record from June 2017, Plaintiff explained that he was helping his father rehabilitate a shower with subway tile at that time. (R. at 625). The ALJ also asked about a note from the doctor which stated Plaintiff had been attending the gym on a regular basis for six months, Plaintiff clarified that he tried to engage in physical therapy activities in an effort to lose weight but was only able to attend approximately four times. (R. at 626). Plaintiff confirmed he had a driver's license but had difficulty driving for long periods of times as has to get out of the car every 45 to 50 minutes. (R. at 627-628).

The ALJ asked the VE, Scott Silver, to identify Plaintiff's past work history. (R. at 628). The VE identified the following: Cable-splicer helper (DOT 829.667-010) SVP 3, medium; Assembler, production (DOT 706.687-010) SVP 2, light; Electronics assembler (726.684-078)

SVP 4, light; Maintenance repairer, building (DOT 899.381-010) SVP 7, medium; Floor layer

(864.481-010) SVP 6, medium; Laborer, stores (DOT 922.687.058) SVP 2, heavy. (R. at

632-633). The ALJ set forth a hypothetical:

> ALJ: ...Hypothetical individuals are the same age, education, and vocational
> background as this Claimant. This hypothetical individual is limited in the
> following ways. The individual is limited to no more than sedentary work. Further
> assume that the individual cannot work on ladders, ropes, or scaffolds, or work on
> slippery or uneven surfaces. Can occasionally use ramps and stairs, and can
> occasionally balance, stoop, and crouch, but not crawl or kneel. No working in
> unprotected heights or around dangerous machinery. Cannot operate a motor
> vehicle as a condition of employment and is limited to simple and routine work.
> Would any of the past work be able to be done by that hypothetical individual or
> the Claimant?

> (R. at 633).

The VE indicated that the hypothetical individual would be unable to do past work, and he

provided the following jobs that the hypothetical individual could do: Order clerk (DOT

209.567-014), SVP 2, sedentary; Final assembler, glasses (DOT 713.687-018), SVP 1, sedentary;

Stuffer (DOT 731.685-014), SVP, sedentary. (R. at 634). The ALJ then set forth a new

hypothetical:

> ALJ: All right. So if I was to further amend that hypothetical individual such that
> they needed a sit/stand option, meaning they'd be able to stay on task- - they could
> do their job either seated or standing and still be on task, they could hold onto a
> position for at least 15 minutes, as needed - - and note I'm saying at least 15
> minutes, so even though it's sedentary work, which would be predominately
> expected to be seated, so I'm not suggesting the person automatically has to switch
> every 15 minutes, but I'm saying they can hold a single position for at least 15
> minutes. Would they be able to do those three jobs; the order clerk the floor- - the
> final assembler, and the stuffer?

> (R. at 634)

The VE responded that all three jobs would remain. (R. at 634-635). He added that a

person can be off task up to 10% of the workday excluding breaks and miss no more than one day

a month during the probationary period. (R. at 635).

Mr. Lavella started his examination of the vocational expert, and he asked the frequency of handling and fingering related to the jobs identified in hypothetical one, the VE responded "frequent to constant." (R. at 636). When Mr. Lavella asked if an individual were limited to frequent handling and grasping with their dominant hand, would they still be able to perform the identified jobs, the VE responded that the assembler and stuffer positions would be eliminated. *Id*. Mr. Lavella asked if being allowed to sit or stand is considered an accommodation for which an employer would need to modify a workstation. (R. at 637). The VE responded no, and noted that based on his experience "everybody seems to have the desks that crank up and down" therefore the employers don't consider it an accommodation. *Id*. In response to this, Mr. Lavella asked for the reduction in numbers as every employer may not have this type of workstation. *Id*. The VE responded, "Well, I haven't done a survey of all the employers, so I'm reluctant to give any numbers, because I have no statistical data to back it up..." *Id*.

The VE noted that "some assembly plants" are retrofitted with specialized chairs and workstations. (R. at 638). He went on to discuss how "some employers" have self-pace work which allows a person to take breaks as needed for a total of one hour, however he also pointed out that "...if somebody takes more unscheduled breaks in the hour and it takes them off task more than 10% they're no going to complete the number of which it's necessary to be competitive." (R. at 639). The VE went on to clarify that a person would need to have unscheduled break time close to 40 minutes to an hour to be considered off task more than 10%. (R. at 639-640). Mr. Lavella discussed how the eyeglass assembler and stuffer position may be performed by machines, and the VE responded that "some do it manually" depending on where

the job is being done. (R. at 640). He indicated that the data he provided is representative of jobs that exist in the national statistics, they are not number specific to each DOT code. (R. at641).

Mr. Lavella made his closing statement indicating that the DDB did not get all of the evidence upon initial review and therefore did not consider listing 1.04. He argued that the combination of all the claimant's impairments would present too many work restrictions. (R. at 643). The ALJ responded that due to the fact that Plaintiff had not received any medical treatment in approximately a year, he would be sent for a consultative examination. *Id.* The ALJ concluded the hearing by requesting the Plaintiff's most recent employment records from his job. *Id.*

In support of remand, Plaintiff first argues that the ALJ's conclusion that Plaintiff could constantly use his hands to engage in fine and gross manipulation is not supported by substantial evidence. Plaintiff contends that the ALJ impermissibly and unilaterally interpreted nearly five years of complex medical evidence in concluding Plaintiff had no limitation to the use of his hands and could constantly engage in handling and fingering bilaterally. (R. at 17) The ALJ concluded Plaintiff had no manipulative limitations whatsoever, despite his diagnoses of bilateral carpal tunnel and cervical radiculopathy, without the support of any examining or reviewing medical expert who opined on Plaintiff's condition.

The Seventh Circuit has established that an ALJ may not unilaterally come to medical conclusions, "there is always a danger when lawyers and judges attempt to interpret medical reports and that peril is laid bare here." *Israel v. Colvin*, 840 F.3d 432 (7th Cir. 2016); citing *Browning v. Colvin*, 766 F.3d 702, 705 (7th Cir. 2014) (noting that administrative law judges are not permitted to "play doctor"); *see also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Here, Plaintiff points out that the

ALJ rejected the disabling opinions of every single medical expert who reviewed Plaintiff's medical records or offered an assessment of his limitations, including the Agency-contracted Consultative Examiner to whom he sent Plaintiff for examination and evaluation of his maximum residual functional capacity. (R. at 507) That examiner opined Plaintiff could never engage in bilateral non-overhead reaching, handling, fingering, pushing, pulling or feeling, limitations which the vocational expert testified would preclude his ability to perform any job and result in a conclusion of disability. (R. at 76, 520) With regard to rejecting disabling opinions offered by the Agency's own consultants, the Seventh Circuit has held "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled can be expected to cause a reviewing court to take notice and await a good explanation here for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014).

Plaintiff also notes that, while the ALJ's rejection of an Agency-contracted examiner's disabling opinion is troubling, his most substantial error lies in his unilateral interpretation of nearly five years of complex medical evidence in concluding what the evidence suggested about Plaintiff's ability to engage in fine and gross manipulation with his bilateral hands. Less than one year ago, the Seventh Circuit held that an ALJ's unilateral interpretation of an MRI report and determination whether it indicated resulting limitations demonstrative of medical equivalence to a listing of presumptive disability was "impermissible" and did not support his conclusion with substantial evidence. *McHenry v. Berryhill*, 911 D.3d 866, 871-872 (7th Cir. 2018). Moreover, the Seventh Circuit reiterated that "[a]n ALJ may not conclude, without medical input, that a claimant's most recent MRI results are 'consistent' with the ALJ's conclusions about her impairments" and "ALJ was not qualified to determine on his own whether the MRI results

would corroborate the claimant's complaints 'without the benefit of an expert opinion.'" *Id.*, citing *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018).

Here, the ALJ did exactly what the Seventh Circuit has forbade, albeit the objective imaging at issue was an EMG and not an MRI. He concluded, without the supportive input of any medical expert, that entire lines of objective evidence, including complex imaging in the form of an EMG suggestive of carpal tunnel syndrome "affecting sensory and motor components" of his dominant hand (R. at 89), failed to support any limitation to Plaintiff's ability to use his hands for manipulative purposes. The ALJ inaccurately concluded "there are no EMG results or other objective medical evidence in the record" to support such limitations. (R. at 15) Additionally, the ALJ, unilaterally and without any support from a medical expert, concluded that a multitude of other objective evidence indicative of at least some impairment to Plaintiff's hands did not merit any manipulative limitation whatsoever: numbness, weak grip, and positive Tinel's sign. (R. at 342, 347, 408, 410). Plaintiff argues that remand is necessary so a medical expert may scrutinize the objective evidence and associated symptoms and offer an opinion of what it indicates about Plaintiff's capacity to use his hands.

Plaintiff states that he has incurred significant harm as result of the ALJ's conclusion regarding the restrictions to the use of Plaintiff's hands. Because the Commissioner bears the burden of proof at Step Five, an ALJ is required to orient the VE to the totality of a claimant's limitations. "[B]oth the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The ALJ must bear the burden of demonstrating someone with all of a claimant's limitations can

perform a significant number of jobs in the national economy. 20 CFR 404.1512 (g); 404.1560(c); 416.912(g); 404.1520 (g); 416.960(c); and 416.920(g). The ALJ bears this burden with testimony of the vocational expert in accordance with the dictionary of occupational titles. S.S.R. 00-4p. Here, the vocational expert testified that a limitation to frequent handling and fingering would have eliminated two of the three jobs the ALJ ultimately concluded Plaintiff could perform in significant numbers, and a limitation to occasional handling and fingering would have eliminated his ability to perform all three. (R. at 76) While the ALJ rejected the Agency-contracted consultative examiner's position that Plaintiff could never engage in any handling or fingering, his unilateral interpretation of the complex medical evidence as indicating not even a minimal limitation in those areas was improper and just as harmful to Plaintiff.

Plaintiff claims that the ALJ further erred in dismissing the only medical expert opinion which touched on Plaintiff's hand-related impairments without clarification, and did so relying only on his own unqualified layperson interpretation of the complex medical evidence. Plaintiff argues that instead of unilaterally concluding that Plaintiff's EMG-confirmed carpal tunnel syndrome and the multitude of correlated objective clinical findings were indicative of absolutely no hand-related limitations, the ALJ should have adopted the opinion of the medical expert, Dr. Mericle or, at the very least, attempted to clarify the opinion he assessed before simply rejecting it and relying wholly on his own medical interpretation of the evidence.

As noted above, the Seventh Circuit has held "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled can be expected to cause a reviewing court to take notice and await a good explanation here for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). In the present case, Dr. Mericle opined the disabling

limitation that Plaintiff could never handle and finger over the course of an eight-hour workday. In *Barnett v. Barnhart*, the Seventh Circuit held that the ALJ should have contacted claimant's doctor for clarification of her medical opinions, and asked for more detail. 381 F.3d 664, 669-670 (7th Cir. 2004) Here, such an action on the part of the ALJ was even more a necessity given the fact no other medical expert scrutinized Plaintiff's hand-related objective evidence and the only doctor who examined him ultimately offered the opinion he should never engage in handling or fingering, an outcome determinative limitation in this case. Rather, the ALJ concluded not only that the Agency-contracted expert was too limiting in his assessment but that Plaintiff actually had no manipulative limitations whatsoever. Such a conclusion is based wholly on the ALJ's own layperson medical judgment. Plaintiff notes that as an alternative to seeking clarification from Dr. Mericle, the ALJ could have sought the opinion of another expert as opposed to concluding Plaintiff had absolutely no hand-based limitations. Plaintiff argues that the ALJ's failure to support his conclusion with any medical expertise deprives his conclusion of the support of substantial evidence, and requires remand so a medical expert may consider Plaintiff's hand-related impairments.

In response, the Commissioner concedes that the ALJ's conclusion that Plaintiff had no limitation whatsoever to the use of his arms and hands was based solely on his own interpretation of complex medical evidence. As noted, the record shows that no state agency reviewing physician ever offered an opinion with regard to how Plaintiff's hand-related etiology and clinical findings amounted to corresponding limitations due to "insufficient evidence" in the file at the time of their review of the case. (R. at 102-103) At the time of that determination, March of 2016, the agency physicians did review an EMG which demonstrated "moderate right cts affecting

sensory and motor components" of Plaintiff's dominant hand. (R. at 89) After the State Agency Reviewing Physicians reviewed the file and concluded there was "insufficient evidence" to offer an opinion with regard to corresponding limitations, nearly five years of medical records spanning from 2013 to 2018 were entered into the file as evidence. (R. at 358-593) These records were demonstrative of hand-related limitations and etiology, and contained significant evidence of clinical correlation to the aforementioned EMG indicative of nerve damage in the upper extremities: numbness in 4th and 5th digits of bilateral hands (R. at 408); weakened grip strength (R. at 408,); difficulty with shoulder abduction (R. at 408); diagnosis of cervical radiculopathy (R. at 400); MRI demonstrating multilevel degenerative cervical spondylosis with canal narrowing and neural foraminal narrowing (R. at 390); and the conclusion of the consultative examiner, Dr. Mericle, that Plaintiff could occasionally reach overhead, never reach in other directions, never handle, never finger, never feel, and never push or pull. (R. at 520). Clearly, the ALJ unilaterally and erroneously concluded that the evidence was unfounded and that Plaintiff's residual functional capacity should reflect no limitation to the use of his upper extremities whatsoever. (R. at 17). The harm of such an error is compounded by the fact that even a slight limitation to frequent use of Plaintiff's hands would have eliminated two of the three jobs the vocational expert testified Plaintiff could perform. A limitation to only occasional use of the hands would have resulted in an ability to perform no jobs in the national economy.

While Dr. Mericle's opinion of limitations to Plaintiff's upper extremities was internally inconsistent with his examination findings, it was not inconsistent with the record as a whole. Given the fact the ALJ was aware of the highly consequential nature of the question of whether Plaintiff had even slight limitations to the use of his hands and the fact no other medical expert

offered any opinion on the subject, clarification of the opinion and examination findings would have been appropriate. The Commissioner acknowledges the existence of at least some hand-related limitations as evidenced by the records contained in the file, "neck pain radiating to the arms with numbness to the fingers on the left stopping at the elbow on the right," examination demonstrating "decreased sensation in right hand." The Commissioner further recognized loss of sensation of the fingers, weakened grip, and difficulty with fine motor skills. As Plaintiff contends, the record clearly supports at least some difficulty with Plaintiff's hands. The ALJ's outcome determinative conclusion of no limitation whatsoever, based wholly on his own interpretation of complex evidence and against the opinion of his own agency's consulting examiner, necessitated, at the very least, clarification of that opinion or scrutiny of the evidence by another medical expert. His own unqualified, layperson interpretation of the complex medical evidence as indicating no limits at all does not support such a conclusion with substantial evidence or the relevant legal standards. Thus, remand is warranted on this issue.

Next, Plaintiff argues that the ALJ erroneously found the limiting effects of Plaintiff's hand-related deficits to be "not entirely consistent" with the evidence. Specifically, Plaintiff argues that the ALJ committed reversible error in rejecting Plaintiff's credibility concerning the intensity, persistence, and limiting effects of his impairments for reasons that are "patently wrong." In assigning an RFC, the ALJ must consider the claimant's testimony, the objective medical evidence, and opinions from medical sources. 20 C.F.R. § 404.1545(3). A court will not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir.2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir.2004)). When the

credibility determination rests on "objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford*, 227 F.3d at 872. A court may reverse a credibility determination if it finds that the rationale provided is "unreasonable or unsupported." *Prochaska*, 454 F.3d at 738 (citing *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir.2006)). "[O]rdinarily a trier of fact's credibility finding is binding on an appellate tribunal. But not if the finding is based on errors of fact or logic." *Allord v. Barnhart*, 455 F.3d 818,821 (7th Cir. 2006).

In the present case, the ALJ first rejected the alleged severity of Plaintiff's hand-related limitations on the false basis there was "no EMG results or other objective medical evidence in the record to support this." (R. at 15) Such a conclusion is contradicted by the record and his own decision. First, the state agency physicians reviewed an EMG from November of 2015 which they deemed to demonstrate "Moderate rt CTS affecting sensory and motor components." (R. at 98) Further, the ALJ's own decision acknowledges Plaintiff exhibited positive Tinel's sign1 on physical examination. (R. at 18) The record further indicated Plaintiff exhibited weakened grip and numbness. (R. at 342, 347, 408, 410) Clearly, the ALJ's rationale that there was "no EMG results or other objective medical evidence in the record to support" Plaintiff's alleged hand-related impairments was a patently false and, therefore, a "patently wrong" reasoning for rejecting his credibility.

Finally, the ALJ found Plaintiff to be less than credible with relation to the alleged severity and limiting effects of his physical impairments because he "reported going to the gym regularly for the first six months of 2017, where he lifted weights, used the elliptical, and walked, which helped him feel better." (R. at 18) Plaintiff contends that such a rationale is patently wrong

because the ALJ totally mischaracterized the extent of Plaintiff's gym attendance in his decision, and the exercise was recommended by his doctors. In *Carradine*, the Seventh Circuit held that prescribed exercise is certainly not inconsistent with disabling pain, "since exercise is one of the treatments that doctors have prescribed for Carradine's pain, and she does not claim to be paralyzed, we cannot see how her being able to walk two miles is inconsistent with her suffering severe pain." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). Moreover, Plaintiff testified that his attempts at exercise failed and were not nearly as extensive as the ALJ characterized them to be in his decision:

> Well, yeah. I wasn't lifting weights, like you know, hitting hard, but they have resistance. That's what my physical therapy was. Like you had to use bands rubber bands for resistance, so I had to use those a little bit. And, I tried getting on a treadmill, and I mean it wasn't a regular -- I don't know why it said regular. I only went for like a month. Maybe four times.

(R. at 626) Plaintiff argues that such a broad mischaracterization of Plaintiff's exercise routine combined with the activity's therapeutic purpose renders such a rationale for concluding exaggeration on the part of the Plaintiff to be a wholly illogical one.

In response, the Commissioner does not contest the fact that the ALJ rejected Plaintiff's allegations of hand-related limitations on the basis there was "no EMG results or other objective medical evidence in the record to support this." (R. at 15) His own agency-contracted physicians acknowledged the existence of an EMG which demonstrated "moderate rt CTS affecting sensory and motor components" of the nerves in his dominant upper extremity. (R. at 89, 98). There is not a more objective demonstration of etiology which could corroborate Plaintiff's allegation he had difficulty using his right dominant hand. Moreover, a multitude of correlative clinical findings also exist within the record: positive Tinel's sign on physical examination (R. at 18); weakened

grip and numbness. (R. at 342, 347, 408, 410). The notion there was no objective evidence to corroborate Plaintiff's alleged hand-related limitation is simply false and thus "patently wrong."

The Commissioner also does not contest the fact that the ALJ gave no consideration to Plaintiff's testimony regarding his extremely limited attempts to go to the gym in compliance with the order of his doctors. Rather, like the ALJ, the Commissioner insists on relying on a characterization of Plaintiff's rehabilitation attempts as a body building effort. Nor does the Commissioner attempt to distinguish the facts of the instant case from those in *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). That Plaintiff tried to improve his condition through rehabilitation exercises recommended by his treating doctors, exercises which he testified he could not sustain than on more than four occasions, does not demonstrate that he was dishonest with regard to the use of his hands. Using such a rationale to come to such a conclusion was patently wrong. This, remand is appropriate on this issue also.

Conclusion

On the basis of the foregoing, the decision of the ALJ is hereby REMANDED for further proceedings consistent with this Opinion.


 Entered: March 9, 2020.


s/ William C.  Lee<br>William C. Lee, Judge<br>United States District Court